No. 13,034.

Carlson *v.* The People.
(15 P. [2d] 625)

Decided October 3, 1932.   Rehearing denied October 31, 1932.

Mr. Max D. Melville, Mr. David Brofman, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Wallace S. Porth, Assistant, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Oscar A. Carlson was found guilty of murder of the first degree and was sentenced to death. He claims, and in our opinion his claim is well founded, that the record discloses prejudicial error that entitles him to a reversal of the judgment.

About 5 o'clock in the morning of September 1, 1931, police officer William Keating discovered Carlson and one William Piskoty in a garage and placed them under arrest. While conducting them to the police call-box in the neighborhood, Keating was shot by Carlson and died

of the wound a few hours later. Carlson and Piskoty were apprehended, were charged with murder, were convicted of murder of the first degree and were sentenced to death. Piskoty was granted a new trial, was convicted again, was sentenced to imprisonment for life, and is serving his sentence.

Counsel for Carlson contend that the court erred in denying Carlson's application for a continuance, and in refusing requests to give certain instructions to the jury. In our opinion, the refusal to grant a continuance was error requiring the reversal of the judgment.

To defend this young man, whose life was at stake, the court, on September 8, just eight days after the homicide and thirteen days before the trial date, appointed David Brofman, a young lawyer who was admitted to the bar less than two years prior thereto. Mr. Melville was not connected with the case in the trial court.

On September 12, Carlson pleaded not guilty by reason of insanity, and was committed to the psychopathic hospital for observation. He remained there five days, during which time, according to his counsel's uncontradicted affidavit, his counsel was unable to consult with him in preparation for trial. Carlson was released from the hospital on the 16th, the doctor's report being that he was sane. The trial had been set for the 21st, and his counsel, on the 17th, moved for a continuance on the ground that it was necessary to bring witnesss from out of the state to testify for the defense on the issue of insanity, and that Carlson was not prepared for trial and needed a more reasonable opportunity to prepare. The application was denied. At the trial the medical director of the psychopathic hospital, called by the prosecution, testified that in his opinion Carlson was "legally sane"; that "at the present time" he "has" no involvement of the central nervous system from syphilis, "which he asserted he had had at one time." Carlson testified that he had been treated for syphilis by a doctor in his home town in Illinois. His counsel asked that the record show

that the doctor referred to, if present, would testify that Carlson had syphilis and that he had acted irrationally and violently. Treating this as an offer of proof, the court denied the offer. In their brief, counsel for Carlson say: "We concede that the motion was imperfect in so far as the showing as to witnesses was concerned, in that it gave no particulars as to names or the specific nature of the testimony to be elicited. We concede also that this 'offer' was ineffective. But it cannot be denied that an adequate motion for continuance could have been drawn in order to protect defendant's rights, and this fact has a direct bearing on the point we wish to make now as to the distinct unfairness of appointing an inexperienced attorney to defend a capital case. * * * Including the time necessary for preparing the motion for continuance, counsel had but four days within which to prepare for trial. Now if the court had appointed a seasoned lawyer, with a background of long experience in serious criminal cases, * * * 13 days might have been enough, although such an expert no doubt would have insisted upon and possibly would have obtained more time. But the court did not follow this course. * * * Instead, the court appointed one of the persons whose name is signed to this brief—one whose license to practice law is shown by the records of this Court to have been less than two years old; one who made no pretense of being an expert in such matters; and the one, be it said, who insists that this plea be made to the court." Carlson was 21 years of age. He was a comparative stranger in Denver, having left his home in Illinois less than four months before his trial.

      The Supreme Court of Illinois thus states the duty of the trial court in appointing counsel for an indigent defendant: "When a court is called upon to appoint counsel for a defendant in a criminal case who is unable to employ counsel for himself, it is the duty of the court to see that counsel is assigned having sufficient ability and experience to fairly represent the defendant,

present his defense and protect him from undue oppression." *People v. Blevins*, 251 Ill. 381, 389, 96 N. E. 214.

■ It is true that the granting or refusal of an application for a continuance is largely within the discretion of the trial court, and the court's ruling should not be disturbed by an appellate court, unless it appears that the trial court abused its discretion, and that the defendant's substantial rights were prejudiced thereby. It is true, also, that there should be no undue delay in the trial of criminal cases. Such delays are likely to prejudice the rights of the people, and thereby defeat justice. But it is equally true that undue haste may prejudice the rights of the accused, and thereby just as effectually defeat justice. The rights of both deserve, and should receive, equal consideration. While undue delay should be avoided, the accused should be given a reasonable time to prepare for trial, and what is a reasonable time depends upon the circumstances of the case. In this connection, it is well to bear in mind this wholesome language used by Mr. Justice Goddard in *In Re Fire and Excise Commissioners*, 19 Colo. 482, 504, 36 Pac. 234, 242: "Reasonable time must always be allowed for the consideration of the rights of parties in the administration of justice under a free government. Monarchical and despotic governments can undoubtedly proceed more speedily than a representative government in the enactment, administration and execution of the laws. Reasonable delay is the price we pay in order to secure the protection and vindication of personal and property rights under a government like ours."

■ As the application for a continuance was insufficient, it may be that, technically, the court did not err in denying it. Nevertheless, we should not permit a man's life to be forfeited to the state because of the failure of his comparatively inexperienced appointed counsel to comply in all respects with technical requirements in making an application for a continuance, if we are satis-

fied, as we are in this case, that the defendant did not have a reasonable time in which to prepare his defense.

For the error of the trial court in denying Carlson's application for a continuance, the judgment is reversed, and the cause is remanded for a new trial.

MR. JUSTICE CAMPBELL, MR. JUSTICE BURKE and MR. JUSTICE ALTER dissent.

By MR. JUSTICE BUTLER:

There are additional reasons that, in my opinion, require a reversal of the judgment, though five of the justices think otherwise. What follows expresses, not the court's views, but my own, in which, however, Mr. Justice Hilliard concurs.

1. Eliminating those parts that are not applicable to the case, instruction No. 7, given by the court, is as follows: ''Murder is the unlawful killing of a human being with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned. All murder perpetrated * * * by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate * * * robbery * * * or burglary * * * shall be deemed murder of the first degree.'' No instruction on second-degree murder, voluntary manslaughter, or involuntary manslaughter was given. Nor were those degrees or grades of homicide included in the forms of verdict submitted by the court to the jury. Counsel for Carlson tendered requested instructions on murder of the second degree and involuntary manslaughter, but the court refused to give either; to which rulings exceptions were saved.

If there was any evidence whatever tending to establish a degree or grade of homicide less than first-degree murder, it was the duty of the court to give an instruction thereon. Such is the law as declared by this court in *Crawford v. People*, 12 Colo. 290, 20 Pac. 769, wherein

we said: "When there is any evidence whatever tending to establish a certain statutory grade of criminal homicide, and the court refuses to charge the jury with reference thereto, error is committed; * * *. By statute the accused in criminal cases is permitted to become a witness, and when once upon the stand all the ordinary rules of evidence apply to him. He is subject to cross-examination, his testimony may be impeached, the circumstances under which he testifies may be considered, and perjury on his part can be as readily disclosed as in the case of other witnesses. The jury are to give his testimony such credit and such weight as in their judgment shall, under all the circumstances, be proper. They may accept it as true or they may reject it as false. But, however incredible or unreasonable such testimony shall seem, the accused is entitled to an instruction upon the hypothesis that it may be true." The word "improbable" is to be preferred to "incredible." In *Boykin v. People,* 22 Colo. 496, 45 Pac. 419, Mr. Justice Campbell, speaking for the court, said, at page 506: "In the light of the evidence it is a matter of regret that this case must be sent back for a new trial. However improbable the story of the defendant * * * the defendant had the right to the judgment of the jury upon it, * * *." In *Henwood v. People,* 54 Colo. 188, 129 Pac. 1010, we reversed the judgment for the trial court's error in instructing the jury that there was no manslaughter in the case. In the opinion in that case, we quoted with approval the following statement found in the syllabus to *Stevenson v. United States,* 162 U. S. 313, 16 Sup. Ct. 839: "On the trial of a person indicted for murder, although the evidence may appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, yet, so long as there is evidence relevant to the issue of manslaughter, its credibility and force are for the jury, and cannot be matter of law for the decision of the court." In *Funk v. People,* 90 Colo. 167, 7 P. (2d) 823, we held

that as there was evidence tending to negative the specific intent necessary to constitute aggravated robbery, an instruction on simple robbery should have been given. The judgment was reversed for the trial court's error in refusing to submit that question to the jury.

In order to understand clearly the theory of the defense, it is necessary to know something about the pistol from which the fatal bullet was fired. It is a .38-caliber Colt automatic pistol. It has no safety lock. It is operated in this manner: A cartridge magazine is inserted in the handle, but such insertion does not load the pistol for firing. Covering practically the entire top and sides of the barrel is a movable metal hood, called the slide. Grasping the handle of the pistol with one hand and the slide with the other, the slide is forced to the rear, thereby cocking the hammer, compressing the recoil spring, and raising the upper cartridge into the path of the slide. The slide is then released, and, being forced forward by the recoil spring, carries the first cartridge into the chamber of the barrel. The pistol is then ready for firing. When the trigger is pulled the pistol is discharged, the pressure of the powder gases forcing the slide to the rear, thereby cocking the hammer, extracting and ejecting the empty cartridge shell, and compressing the recoil spring. The return movement of the slide, under pressure of the recoil spring, raises another cartridge in front of it and forces the cartridge into the chamber of the barrel. The pistol then is ready to be fired again.

The testimony given by Carlson and Piskoty is substantially as follows: On the night in question, Carlson and Piskoty went out in the latter's automobile for a pleasure ride. Carlson took his pistol because he feared that an associate named Peterson, with whom he had quarreled, would appropriate it. The cartridge magazine was in the handle, but there was no cartridge in the chamber of the barrel. Deciding to burglarize the McCarty-Sherman Motor Company's garage, they parked the automobile on a lot across the alley, broke into the

garage, entered the office and tried, but without success, to open the safe. Seeing a police officer at the street corner, they fled from the building. While climbing through a window in the office partition, Piskoty lost the ignition key to his automobile. Carlson returned to their room. Piskoty stayed around for about a half hour and tried to get his automobile started, re-entering the building in an unsuccessful search for the lost key. Finally, he too returned to their room. At Piskoty's request, Carlson went with Piskoty to remove the automobile. This was about two hours after Carlson left the garage the first time. At Piskoty's suggestion, they entered the garage to search for the ignition key. As they approached the office, officer Keating stepped from a doorway and arrested them. As he was conducting them to a police call-box in the neighborhood, Carlson, wishing to get rid of his pistol by throwing it away or dropping it without its being seen by the officer, removed it from his belt and carried it in his hand. For some reason, the officer drew his revolver and leveled it at them. Fearing that the officer would commence shooting, Carlson ordered, or started to order, the officer to raise his hands, whereupon Piskoty grasped the slide of Carlson's pistol. Carlson, fearing that the officer would shoot, pushed the pistol, trying to drop it or throw it away. In the struggle, the pistol slide was pushed back, thus loading the pistol, and, as Carlson had a tight grip on the handle, the pistol was accidentally discharged, mortally wounding the officer. The pistol was automatically reloaded and, almost instantaneously was again discharged, the second bullet striking the officer in the foot. Carlson and Piskoty then fled from the scene. Carlson testified that he did not push back the slide, that he did not inject any cartridge into the chamber of the barrel, that he knew that the pistol was not ready for firing, and that he did not intend to shoot.

The evidence in behalf of Carlson tended to show involuntary manslaughter, or, at most, second-degree mur-

der. The question of the truth or falsity of that evidence is exclusively for the determination of the jury. Under the rule announced in *Crawford v. People, supra,* the trial court erred in refusing to instruct the jury on those lesser degrees or grades of homicide.

If Carlson committed murder in perpetrating or attempting to perpetrate burglary, or in attempting to rob the officer of his revolver, it was murder of the first degree, even though he did not act wilfully, deliberately and with premeditation. If he committed murder, and, though not in the perpetration or attempt to perpetrate burglary, or in an attempt to rob the officer, killed wilfully, deliberately and with premeditation, he was guilty of murder of the first degree. If he committed murder, but not in the perpetration or attempt to perpetrate burglary, and not in an attempt to rob the officer, and did not kill wilfully, deliberately and with premeditation, he was guilty of murder of the second degree. One who, in resisting a lawful arrest, intentionally kills the officer making the arrest, is guilty of murder. 29 C. J. 1093; 21 Am. & Eng. Ency. (2d Ed.) 141; Wharton on Homicide (3d Ed.) §385. In Blackstone's Commentaries, p. 200, it is said: "In like manner, if one kills an officer of justice * * * in the execution of his duty, * * * knowing his authority * * *, the law will imply malice, and the killer shall be guilty of murder." If he kills wilfully and with deliberation and premeditation, it is murder of the first degree; otherwise it is murder of the second degree. Wharton on Homicide (3d Ed.) §385. Of course, if Carlson committed murder in perpetrating or attempting to perpetrate burglary, or in attempting to rob the officer, it was first-degree murder, even in the absence of deliberation and premeditation. If Carlson did not commit murder in perpetrating or attempting to perpetrate burglary, or in attempting to rob the officer, or in resisting arrest, the statutory provisions with reference to involuntary manslaughter would apply. Section 6669, Compiled Laws, is as follows: "Involuntary manslaughter shall consist

in the killing of a human being without any intent so to do; in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner; *Provided, always,* That where such involuntary killing shall happen in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder.'' Robbery and burglary are felonies. An intent to commit either of those crimes is a felonious intent.

The court should have instructed on murder of the second degree and on involuntary manslaughter. Its failure to do so was error.

2. It is suggested in my brother Burke's opinion that if the court erred in regard to instructions, it was error without prejudice. The suggestion, and the reason given in support thereof, are not without weight; but they fail to convince me that, considering the entire record, we would be justified in sending this young man to the gallows; much less do they convince me that we are required to do so. Where, as here, a human life is at stake, I am not disposed to indulge in over-nice speculation as to what a jury might or might not have done had they been properly and fully instructed by the court.

In *People v. Blevins,* 251 Ill. 381, 96 N. E. 214, it seemed that the defendant's guilt was clear, but because improper evidence was admitted, though without objection, the death sentence was reversed. The court said: ''Counsel for the State insist that even if the court did err in the respects pointed out, the evidence so conclusively shows the guilt of the plaintiff in error that the judgment should not be reversed. It is true, error will not always reverse in criminal cases where the guilt of the accused is conclusively shown, * * * but to this rule **there are some** exceptions. In murder cases the jury fixes the punishment to be inflicted, and the legislature has seen fit to allow a wide range in determining what

the punishment shall be, the minimum being fourteen years in the penitentiary and the maximum death. In this case the death penalty was fixed by the jury, and it may well be that the weak manner in which plaintiff in error was defended, the vigorous manner in which he was prosecuted by four able and experienced lawyers, and the admission in evidence, on the trial, of incompetent testimony calculated to prejudice and degrade plaintiff in error in the minds of the jury, influenced the jury in determining the punishment that should be inflicted. * * * Whatever view we might entertain of our duty in this case if the punishment had been fixed at less than the maximum, to say that, notwithstanding important rights plaintiff in error was entitled to under the law were not accorded him on the trial and his punishment fixed at death, we think he was not prejudiced, and that the verdict of the jury must have been the same and the punishment fixed at death even if he had been accorded the rights he was entitled to, would be to establish a dangerous precedent and one not justified by the law or the natural instincts of humanity.''

3. The court instructed the jury that murder committed in the perpetration or attempt to perpetrate robbery or burglary shall be deemed murder of the first degree. No statutory or other definition of robbery or burglary was given, as it should have been, and the jury were left to guess at the nature of those crimes. Counsel did not tender instructions defining robbery and burglary. Such instructions, if tendered, undoubtedly would have been given. Counsel's neglect in this respect was owing, no doubt, to his youth and inexperience.

4. The court instructed the jury that murder ''perpetrated by any act greatly dangerous to the lives of others and indicating a depraved mind regardless of human life, shall be deemed murder of the first degree.'' Ordinarily, an instruction in the language of the statute is sufficient. Those parts that are not applicable may be considered mere surplusage, unless, as in the present

case, they tend to mislead the jury. The language quoted above relates to universal malice, which was not present in this case. The instruction was misleading and prejudicial. The jury might well have believed that, as shooting at the deceased was greatly dangerous to the life of the deceased, the act constituted murder of the first degree, regardless of the question whether the act was committed in the perpetration of or attempt to perpetrate robbery or burglary, and regardless of the presence or absence of deliberation and premeditation. In *Longinotti v. People,* 46 Colo. 173, 102 Pac. 165, we held that the language in question does not include a case where the killing results from the intentional shooting of the person slain, and there is no showing of universal malice. In the opinion, we quoted the following language of Mr. Justice Sheldon, in *Darry v. People,* 10 N. Y. 120: ''For these reasons I am entirely satisfied that this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of many persons in jeopardy without being aimed at any one in particular, and are perpetrated with a full consciousness of the probable consequences. Such acts may well be said to evince that reckless disregard of and indifference to human life, which is fully equivalent to a direct design to destroy it. The moral sense of mankind distinguishes between acts of this sweeping and widely dangerous character and ordinary cases of individual homicide, and so, in my judgment, does the statute. But there is an additional reason for putting this construction upon the subdivision in question. If it can be so construed as to include the case at bar, and others of a similar description, we are left wholly without any line of distinction between murder and manslaughter, except the loose and uncertain opinion of a jury as to whether the act which produced death did or did not evince a 'depraved mind, regardless of human life.' There is scarcely a case of manslaughter which, upon this construction, may not be brought within

the definition of murder, and punished as such, provided a jury can be found to say that the act which produced death evinced a 'depraved mind, regardless of human life'; because the other clause, to wit, 'imminently dangerous to others,' if it can apply to this, would apply to every case of homicide, as the result would always prove the imminently dangerous nature of the act; and because, upon this construction, cases of homicide committed unintentionally, in the heat of passion, would not be excluded, as such a case might very well evince a depraved mind, regardless of human life, in the opinion of the jury.'' Counsel did not request an instruction explaining the meaning of the quoted part of the court's instruction. Had such an instruction been requested, it undoubtedly would have been given; or if counsel had objected to the inclusion of that language in the instruction without an explanation of its meaning, the objection, no doubt, would have been sustained.

In the circumstances, even if, by reason of appointed counsel's oversight in these particulars, Carlson is not in position to insist upon a consideration of these points, this court, in the interest of justice, may, and in the present case I believe it should, consider them. See *Mandell v. People,* 76 Colo. 296, 231 Pac. 199; *People v. Yund,* 163 Mich. 504, 128 N. W. 742; 17 C. J. p. 369. Where counsel is appointed by the court, courts are more alert to protect a defendant in such a situation than they are when a defendant was represented at the trial by counsel employed by him. *People v. Thompson,* 321 Ill. 594, 152 N. E. 516.

It sometimes happens that where there are several errors, neither one of which, taken by itself, is sufficient to require a reversal, their cumulative effect may be so prejudicial as to call for a reversal. *White v. People,* 79 Colo. 261, 245 Pac. 349. That, in my opinion, is the situation in the present case.

The judgment, it is respectfully submitted, should be reversed for the reasons stated in this special opinion, as

well as for those assigned in the opinion of the court, ante.

Mr. Justice Burke dissenting.

I am unable to concur in the reversal of this judgment. I think the court's opinion answers itself. The general rule is that the disposition of a motion for a continuance rests in the discretion of the trial court and reversal follows only a clear abuse thereof. *Stone v. People,* 71 Colo. 162, 204 Pac. 897; *Davis v. People,* 77 Colo. 546, 238 Pac. 25; *Doll v. Stewart,* 30 Colo. 320, 328, 70 Pac. 326. Continuances on the ground of absent witnesses are often applied for, and sometimes granted, when the witnesses thereafter either fail to appear or to give any material, competent and relevant testimony. Again, such continuances are granted when they fatally injure the prosecution, and the missing testimony, when it comes, relates to a trivial or an admitted fact. Hence the general rule that the application must be supported by a showing of necessity, competence, materiality, and diligence. This can rarely be made save by setting forth with particularity what the absent witness would testify to if present. The party opposing the continuance may then often avoid the delay by an admission that the witness, if present, would so testify. Thereupon the jurors are instructed to consider such testimony as before them. In view of the admitted insufficiency of the application here I think there was no abuse of discretion.

The court's opinion, I think, assumes that youth and inexperience necessarily mean incompetence. But the ability of trial lawyers is often comparatively unrelated to age and years of practice. Hence the discretion vested in the trial court to determine the time necessary for given counsel to prepare a given case. On the face of this record the time allowed appears meager, but I find nothing to overcome the presumption that it was sufficient.

With the foregoing conclusions I am authorized to say that Mr. Justice Campbell and Mr. Justice Alter agree.

To justify reversal, both error and prejudice must be disclosed by the record. Defendant's contention that reversible error was committed by the court's refusal to instruct on second degree murder and manslaughter rests upon his right to such instructions based upon his testimony concerning two alleged involuntary discharges of his pistol. That right rests upon a rule thus stated in the Crawford case. ''However incredible or unreasonable such testimony shall seem, the accused is entitled to an instruction upon the hypothesis that it may be true. *Crawford v. People,* 12 Colo. 290, 20 Pac. 769. Of course that statement cannot be accepted literally. Testimony that the 4th of July fell on the 25th of December, that two plus two equals seven, or that the world is flat, calls for no instruction on the hypothesis of its truth. The testimony which calls for such an instruction must rise to the dignity of evidence, must be capable of supporting or preventing a finding. Defendant's theory of the involuntary discharge of the pistol presumably finds its support in the peculiar mechanism of the weapon. It was before the jury and is before us. After a careful examination of it I class defendant's testimony concerning it with the illustrations above given. In my opinion it does not rise to the dignity of evidence. Hence I think there was no error.

But, assuming error, prejudice follows only if the giving of the requested instructions might have reduced the degree of guilt. We can only say it might if we further assume that the jurors would, in effect, have said ''If the law permits no alternatives for this defendant but death or life imprisonment we will hang him; but if it also permits a sentence of one day in jail we will give him that.'' The human mind does not work thus.

With this conclusion on the subject of instructions Mr. Chief Justice Adams, Mr. Justice Campbell, Mr. Justice Alter and Mr. Justice Moore agree.